for appearing by video conference for this oral argument session. The court has four cases set for argument this afternoon. Madam Clerk, would you please call the first case for argument? Case number 19-3400, the District of North Dakota, United States v. Billy Herman. All right, Ms. Steinholt, we'll hear from you first. May it please the court. My name is Rachel Steinholt on behalf of Mr. Herman. We are asking this court to remand Mr. Herman's case for resentencing. Mr. Herman received a life sentence and in ordering this life sentence, the District Court departed and varied upwards based upon a combination of impermissible considerations as well as considerations unsupported by the record. Each error provides an independent basis warranting remand. The first error was the District Court's use of the Post-Conviction Risk Assessment Tool, or the PICRA for short. The PICRA is a tool exclusively utilized by probation. And in our district, it is included in every defendant's pre-sentence investigation report. It has a narrow lens. It provides an estimate of a defendant's likelihood of re-arrest or revocation. That's it. Re-arrest or revocation. It explicitly states that it is not a recommendation regarding the type or length of a prison sentence. At sentencing, the District Court did just that. Utilize the PICRA in support of his departure and variance upwards, or stated differently, the The court makes a number of findings supporting the enhancement. First, there were a handful of factual disputes unsupported by the record. Mr. Herman's ex-wife had a version of events that didn't align with the medical examiner's findings. And unless the court has specific questions for this error, we rely on our briefing. The remaining errors deal with what falls within the heartland of second-degree murder. Specifically, whether Mr. Herman's ex truly reflects extreme conduct that falls outside the heartland, so warranting departure. It doesn't. Independently, each of these errors warrant remand for re-sentencing. Starting with the court's usage of the PICRA. First, why is this error? This is an error because the PICRA explicitly states that it should not be considered for two things. The length and the type of the sentence, and then as a risk assessment tool to predict domestic violence. Here, the court used PICRA in both of those ways. Another reason this is an error is because the PICRA is based upon re-arrest and revocation rates within 190 days of release. That's a snapshot in creating a PICRA. It's meant to predict both revocation and arrest for new criminal behavior over the term of a six-month release period. So this is not an accurate view of overall rehabilitation. It's also an error because implicit bias is a risk that's inherent in all risk assessment tools, and in particular, the PICRA as well. This is because we don't know how the tool is administered. We don't know the methodology behind the tool. In risk assessment tools in general, they do lack transparency and scoring. They can conflate correlation with causation. They can classify individuals based on group data. Counsel, I want to ask you about what the court said that it will not rely on PICRA in rendering this decision in response to a question from defense counsel, and that it was not his intent to indicate that to the parties. Is that a problem for your argument, given that the district court explicitly disclaims using PICRA for the purpose you said he did? It isn't a problem, Your Honor, and the reason is while we do normally take a judge's statements at face value, here the timeline just proves that that's implausible to do. First, we have the district court states that it would use the PICRA in determining the sentence. Then we have the district court actually ordering the life sentence. Then we have Mr. Herman objecting to the use of the PICRA for sentencing purposes, and then both parties are heard on this issue. Then we get to the transfer pages that you cited, where the district court states, well, okay, I'm clarifying. I will not use the PICRA. But at that point, the sentence had already been administered. So just based on the timeline alone, while we normally take a sentencing court's statement that they're not using something at face value, here the timeline just makes that impossible. What would you have the district court do? Should the district court then, in your view, to avoid the error, come back and say, well, I know I've already sentenced the defendant, but I'm going to go through it all again because I have an error. What was the district court to do in your view? Yes. We feel that remand for resentencing is appropriate here, and this court has done that before. I mean, what was the district court to do so that there wouldn't have been errors? So you're saying it came too late. I'm saying, what was the district court to do other than say what he said? Sure. Thanks for the clarification. The court could have said that it would have reached the same result either way. The court doesn't do that here. The court just, all the court did was clarify, no, I did not use the PICRA for sentencing, which is different than saying that it would have reached the same result either way. So we know that this error isn't harmless, and for that reason. And harmless error is the government's district court's conclusion, and we can't reach that here. And the government as the beneficiary of that error, they bear the burden of demonstrating that the district court would have imposed the same sentence. And they just can't meet that burden here. Moving on to the issue of the 5K 2.8 departure, which specifically that the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim. So departures are meant to apply in rare circumstances. Here, by their nature, in this case, we have second degree murder, and we know that murders are cruel. It is hard to imagine a murder that is not going to be cruel. But the question is, is whether that's unusually cruel. And many of the characteristics that the court cites don't support that Mr. Herman's conduct was unusually cruel. And so some of the findings that the district court made was that Mr. Herman didn't call for medical help. It doesn't seem unusual for somebody who commits second degree murder not to call for medical help. Similarly, that Mr. Herman didn't notify law enforcement. Again, it seems like it would be the unusual defendant that would actually notify law enforcement that they just committed second degree murder. Similarly, that Mr. Herman did not notify the family. There's a trend here. So again, it does seem like it would be the unusual defendant that would notify the family that there was a second degree murder. You know, counsel, I get all that. But here, I wonder whether the nature of the strangulation and then you had driving to another place, strangulation, you have the defendant hopping, you know, jumping up and down while strangling and then tying concrete blocks. That is, I gotta say that's significantly more heinous than a lot of second degree murders I've seen over my career. Does that justify it? It doesn't. And I'll take that question kind of in parts here. The first part is that we dispute a number of those of those allegations. And indeed, I don't think the medical examiner specifically starting with the strangulation, the medical examiner expected to see evidence of strangulation and never did. So we dispute that that happens in the first place. Similarly, with two assaults on two different locations, Mr. Herman maintained that it was the one assault at the bridge and the disposal. I'm glad you brought up the disposal of the of a body. And if it's not the unusual case, it would be within the normal parameters of a second degree murder to to conceal the evidence of the crime. So I don't think that those points in and of themselves bring this outside of what a typical second second degree murder entails. And here, Mr. Herman's original sentence guideline range is presumed to be is presumed to be reasonable. It was 292 to 327 months. That is not a short amount of time. That's 24 to 27 years. That is a good chunk of Mr. Herman's life. He's in his low 40s at the time of this offense. And that would have been sufficient, but not overly punitive to to warrant the to render the conduct of the crime here. If the judges have no questions, I'm going to reserve the remainder of my time for rebuttal. I do have one question, which is, I think the district court, if I'm correct about the right case, also did a variance here, which would render any problems with departure harmless. Am I you're correct that the district court did warrant did render a variance here. So the sentencing discussion, he does use variance and and departure interchangeably. So there are a number of problems with the variance. Specifically, he did use the picker to support the variance. So that's and we know that the picker is improper. And and that's important because the picker not only was improper, but it was used to. It was used to discuss whether or not Mr. Herman could be rehabilitated. And in ordering a life sentence, we know that he found that he could not be rehabilitated. And a life sentence is extraordinary. So we know that at least the picker influenced the variance. And oh, I'm just getting you might be getting this. Is that the only argument that transfers over to the you know, in terms of the factual findings, some of which you listed, which we respectfully disagreed with about the strangulation and that kind of that was also used to support the departure. The picker was used to support the support the departure. Those for the same reasons that we said that they don't warrant this to be outside of a normal second degree murder that would fizzle out any sort of merit warranting it to be a possible variance as well. And again, I do want to return to the fact that his original guideline range of 292 to 327 months is an extraordinary amount of time, especially for somebody, you know, who's in their early 40s. That's what's mounted in his mid 60s. So it is that was presumed to be reasonable and both the variance and the departures were flawed and warrant reversal. I'm going to reserve the remainder unless the judges have any questions. I'll reserve the remainder of my time for rebuttal. Very well, thank you for your argument. Mr. Chase, we'll hear from you. May it please the court, counsel. My name is Nick Chase and I'm the Assistant U.S. Attorney in the District of North Dakota. I will start my arguments addressing some of the questions that were posed to Ms. Steinholt. Number one, she raised the picker. And as Judge Strauss pointed out the district court when that was raised, stated twice that it was not relying on PICRA as part of its decision and specifically found that it was going to rely on the criminal history calculation in the PSIR and stated that it did not intend to indicate to the parties that it was relying on that. You know, based on that the Ms. Steinholt said that they accept that explanation, but yet they don't. You have the district judge saying, I'm not relying on it. And if you look back at his conversation and he starts at page 355 and it goes from many pages. He first talks about the defendant's criminal history and the number of the fact that he has 19 criminal history points, that he has 10 violations of prior court orders and probation. Talks about that he said on page 355, just talking about the criminal history, that this has to do with the defendant's ability to be rehabilitated, his willingness to comply with the law, seriousness of the offense, need to be rehabilitated. Then on several pages later, 362 to 364, that's when he gets into his PICRA conversation and goes back and forth between PICRA and the PSIR. Again, talking about those aspects and basically he's talking about two things, but he's getting at the same thing, which is that this defendant's history. He's not picking up some magic eight ball or a Ouija board that says the score is this. He's looking at actual factors that comprise the PICRA and he's comparing them with what he sees in the PSIR. At that point when he's called on it, he says, well, I'm not relying on the PICRA, but there's a congruence between the two. Then says he didn't mean to indicate that to the parties. The law, as everybody recognizes, is that we all take the district judge's orders for what he says they were, which is that he didn't rely on it and he didn't mean to indicate that he was. To the extent that we look beyond that, again, the argument that the defense is making is that somehow by the timing that this was a gotcha. Once he said that, this was a bell that he couldn't unring. Well, we're still in the sentencing hearing. Yes, he's made a pronouncement of the sentencing, but we're still in the sentencing hearing. First of all, he said that he didn't do it and that he didn't mean to say it, but even if he had, he said, I didn't do it. I didn't mean to indicate it. There's no sufficient fix to the perceived problem. I would also point out that this comes at the end of many pages of findings on both the upward departure and the upward variance. Any possible error with the mentioning of the PICRA could only be viewed as harmless error because of the extensive findings on the upward departure and variance. With respect to the variance, again, as Your Honor pointed out, and Your Honor, Judge Strauss was on the Weiscarver panel where they looked and specifically found this is well-established law. The district judge finds an upward variance that alternatively imposes upward departure and the judge does so in error, it's harmless because a district court would have imposed the same sentence absent the error. When you look at this court's previous cases on upward variances, the Vandebrink, which is lack of remorse, Larrabee, which is a person with a history of violence, unprovoked attack, didn't get any help for the victim, Archambault, had tribal convictions that weren't calculated, danger to the public, poor behavior on supervised release, Heatings, based on probation violations, Braggs, talked about respect for the law and protecting the public, Barrett, based on recidivism and underrepresented criminal history. All of those cases, all of which are cited in our brief, are squarely applicable in this case. The court found, again, there was 19 criminal history points, 10 violations, there was a lack of contrition and remorse, the defendant never sought help for Ms. Barrett, thanks to the victim, after assaulting her. So all of everything that's in play in this case is squarely applicable to upward variance issues. Now, the housing council says, though, on the upward variance that a lot of the errors should transfer over from the departure to the variance because it all happened. In other words, the district court kind of did these things interchangeably, talked about them interchangeably, so the errors he made for the departure should apply to the variance. Could you address that argument for me? Yes, your honor. I think in all of the cases I just mentioned, you know, talking about the recidivism, I mean, that's undisputed. Talking about the multitude of violations of probation violations in the past that this court has recognized as a basis for an upward departure, I'm sorry, an upward variance. That's undisputed in this case. There are many, many aspects that the court talks about that this defendant has a determined violent past. All of the history of violence that the defendant had toward his now ex-wife, Crystal Herman, and against other women, he has had a determined violent past in extensive criminal history. He committed most of these crimes while he was, you know, while he had broken an ankle bracelet and was, you know, was breaking probation then. After the crime, he doesn't show any kind of remorse. He goes on another crime spree where he commits more violent crimes with a baseball bat, those strong arm robberies. All of these things, his reaction, there's no remorse. His extensive criminal history, the brutality of the crime itself, that's not adequately taken in consideration. All of those things, almost all of which are undisputed, all support the upward variance, your honor. With respect, I'd also point out that the question that the nature of the murder itself lends itself to a determination of extreme conduct. Certainly, based on our brief, our position, it certainly is. I mean, this was a multifaceted attack occurring in two locations. She rode in her own trunk, wrapped in a tarp for 15 to 20 minutes, begging for mercy. And, you know, on the other end, more beatings, four hits with a shovel on her head, again, wrapped up in a tarp. It would have taken a long time to, the judge noted, to tie the knots that are represented in the pictures. This is an extended attack. The terror must have been enormous and is simply not the type of inherent extreme conduct that normally people would find in a second degree murder case. The only other issue that I wrote down that was, I think I've covered everything that the court asked Ms. Dean Holt. Unless there's any questions, I would, are there any questions by the court? Apparently not. Thank you for your argument, Mr. Chase. Okay, thank you. You're not required to use all of your time, so. I appreciate that. We'll take the case on what you've said. Ms. Dean Holt, though, we'll hear from you in rebuttal. Thank you, your honors. To the point of the district court not relying on the PICRA and stating, I did not intend for the parties to believe that I was relying on the PICRA. It just seems inconsistent when you look at pages 362 to 363 of the transcript, where he goes into this lengthy discussion about, I'm using the PICRA, within the PICRA, Mr. Herman, you are a level four, and that means that you have a 42% chance of rearrest and a 70% chance of being revoked. And then later on to say, oh, no, I didn't intend for the parties to believe that I was relying on that. It just doesn't hear the objection. If the court wanted to hear the objection, as Judge Strauss had asked in the beginning, what he could have done was said, I would have reached the same results without consideration of the PICRA. But that is not what he said. He said that I did not intend for you guys to believe that I was using the PICRA. That was not my intent. So that's the issue with the PICRA. We know it's an improper factor. The PICRA itself tells us it's improper to use it this way. And he used it for the variance and the departure. And so we know that that's reversible error. And it is the government's burden. Once an improper factor, reversible error is established, it is the government's burden to then say, to prove why that error isn't harmless. We said how the district court could have done that. I would have reached the same result either way. Here, the district court did not do that. And that burden is not met. We rely on our earlier statements about how this, while second-degree murders are sad and they're cruel and they're terrible and senseless, and every other adjective that you can think of for murders, they're terrible. But the issue is whether or not this conduct goes outside of the typical second-degree murder. And based on our briefing, based on what we've already stated earlier, it just, it doesn't. And Mr. Herman's original guideline range of 292 to 327 months was more than sufficient to cover the conduct present in this case. I must, Your Honor, have any questions. I submit that this case should be remanded for reconsideration. Thank you. All right. Thank you for your argument. Thank you to both counsel. The case is submitted and the court will file an opinion in due course.